In re the MARRIAGE OF Monica L. NOELTNER,
Petitioner-Respondent-Appellant,

and

James L. Noeltner,
Respondent-Appellant-Respondent.

Nos. 39164, 39187.

Missouri Court of Appeals,
St. Louis District,
Division Four.

June 6, 1978.

Motion for Rehearing and/or Transfer
Denied July 14, 1978.

Lawrence N. Koeln, Centerville, for petitioner-respondent-appellant.

Daniel E. Rogers, Thomas P. Roberts, Clayton, for respondent-appellant-respondent.

DOWD, Presiding Judge.

A custody dispute. Monica Noeltner and James Noeltner were married April 8, 1967. A son Dana Michael was born March 5, 1968, and a daughter Tess Louise was born November 15, 1969. The parties separated December 28, 1974, and on March 10, 1977 the dissolution proceedings began in the circuit court of St. Louis County. On March 16, 1977 a decree dissolved the marriage and granted respondent James Noeltner custody of Dana and petitioner Monica L. Noeltner custody of Tess. The court also ordered respondent to pay petitioner $1.00 per year maintenance. Both parties appealed and the appeals were consolidated. In this court tried case, we must affirm unless there is no substantial evidence to support the judgment, unless it is against the weight of the evidence or unless it erroneously declares or applies the law. Rule 73.01; *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

The husband first claims the trial court erred in awarding primary custody of Tess to his former wife because such award is not in the child's best interests. We agree.

The following facts were elicited at trial. Before the parties separated, Mr. Noeltner was working evenings for the railroad. While he was at work his wife had at least two parties although her husband was not aware that she did so. At one of the wife's parties the guests played strip poker, and Dana stated he saw one person naked. In November, 1974, Monica Noeltner started keeping company with Carl Davis. Mrs. Noeltner moved out of her home on December 28, 1974, and took both of the children with her, as well as $2,000, half of the joint savings account. She moved into an apartment with Carl Davis, her brother and her brother's girlfriend. She and Carl slept together in one bedroom, the two children slept in the other bedroom, and her brother and his girlfriend slept together in the living room. Her brother was not yet 21 years old at this time and his girlfriend was 17. Both of them testified that they used marijuana and amphetamines before moving in with Mrs. Noeltner. After Mrs. Noeltner and the children lived in this apartment two weeks, Mr. Noeltner picked Dana up at school and retained custody of him. Mrs. Noeltner continued to live in the apartment with Tess and Carl Davis and her brother and his girlfriend for four months. Tess saw her mother and Carl Davis in bed together four or five times and questioned her mother about it. She also saw her mother's brother in bed with his girlfriend. During this four-month period, Mrs. Noeltner's brother and his girlfriend were arrested for and later convicted of burglary of a dwelling and stealing a tape-deck and $10.00. Also during this time her brother was arrested for flourishing a rifle at respondent-husband. For the burglary her brother was jailed three months and given three years probation. He received a three months suspended sentence for the flourishing conviction. His girlfriend was sentenced to live for three years on proba-

tion at a halfway house for the burglary but became a fugitive when she failed to appear at the halfway house and was sentenced to six months in the county jail.

On May 1, 1974, Mrs. Noeltner and Tess moved to a new apartment in the City of St. Louis. There were two burglaries at this residence while they lived there, although no one was harmed. Carl Davis did not live there with Mrs. Noeltner but he would stay for a week at a time and they had sexual relations there. Her brother also stayed there for about six weeks after he got out of jail. His girlfriend stayed overnight at the apartment several times and the two of them engaged in sexual relations there.

In October of 1975, Mrs. Noeltner talked to a domestic relations worker and stated she planned to marry Carl Davis. She further stated that she did not feel that the age and racial differences would affect their marriage.[1] On December 24, 1976, Monica Noeltner gave birth to Carl Davis' baby. At trial Monica Noeltner indicated that it was now unlikely that she would marry Carl Davis although Carl seemed to still be interested in marriage. Tess has told her friends that Carl Davis is her father and that the illegitimate baby is her brother. As of the time of trial, Carl Davis had not had full-time employment for eight months and so had no way to contribute to the support of his and Mrs. Noeltner's illegitimate child. Carl Davis seems to have a violent temper. A legal investigator who served a subpoena on him pertaining to the dissolution of marriage proceeding testified that Carl Davis threatened to kill Mr. Noeltner, his attorney, the judge and the legal investigator himself, and used vile and obscene language.

James Noeltner now lives in Cicero, Illinois with Dana. He acknowledged that before he and his wife were separated he did not pay much attention to the children. He explained this was because he frequently worked 16 hours at a time but on week-

1. Carl Davis is black and Monica Noeltner is white. At the time of trial, Monica Noeltner was 29 years old and Carl Davis was 22 years old.

ends spent a great deal of time with the children, taking them to picnics and the zoo. However, since he has had sole custody of Dana, he has been a very good father. He is interested in Dana's education and attends PTA meetings at the parochial school where Dana is enrolled and has conferences with Dana's teachers. He takes Dana to church every Sunday, and Dana serves as an altar boy there. When Dana is dismissed from school each day, he goes to a classmate's house where his father picks him up at 4:30. He is with his father every night and on weekends. Mr. Noeltner prepares his son's meals, buys him clothes, toys and books, and has taken him to Disneyland and to parks and zoos throughout the country. He enrolled Dana in a local park district program one summer where Dana took swimming lessons. Dana spoke to the judge in chambers and stated he was not happy when he lived with his mother and that he preferred to live with his father.

■ The child's interests and welfare predominate over all other considerations in a custody dispute. *L. W. v. G. W.*, 534 S.W.2d 826, 829[1] (Mo.App.1976), RSMo. § 452.375. The presumption that a mother is better fit to have custody of a young child is not conclusive. *Johnson v. Johnson*, 526 S.W.2d 33 (Mo.App.1975).

■ The moral fitness of a parent is a vital factor in determining who should have custody of a child. *L. H. Y. v. J. M. Y.*, 535 S.W.2d 304, 307[8] (Mo.App.1976). The statement we made in that case applies with equal force here. We stated at 307: "The mother, of course, is entitled to have her own social life. But the mother's associations with men have not been harmless peccadillos, and we cannot ignore that her conduct may have an ultimate effect on the growth and character of her [child]." We further noted that private personal conduct by a parent which is likely to affect children during the years in which their character, morality, virtues and values are being formed cannot be ignored by courts and that a parent's private conduct in the presence of a child or even under some other circumstances may well influence his or her young, impressionable life. *L. H. Y. v. J. M. Y.*, supra, 535 S.W.2d at 308. Thus it is

not only the parent's licentious conduct, but the child's exposure to it, that the courts examine. *In re Marriage of L. M.*, 541 S.W.2d 760[4] (Mo.App.1976). Here Tess Noeltner, aged five, was exposed to a lifestyle where her mother lived with a man out of wedlock and gave birth to his illegitimate child. Tess's uncle, age twenty, lived and slept with his seventeen year old girlfriend openly at Tess's house and Tess saw them in bed together. During this time her young uncle and his girlfriend burglarized a home. Even when Mrs. Noeltner moved into a different apartment with Tess, Carl Davis would stay there for a week at a time. Mrs. Noeltner's brother also moved in after he got out of jail and his girlfriend slept there with him 10–20 nights.

Mr. Noeltner stated he wanted custody of both children so that "they are brought up in a wholesome way and in a good Christian background." He stated he felt that he was better prepared than Mrs. Noeltner to maintain a good atmosphere in which to raise both children. We agree.

In summary, there was strong evidence that Mrs. Noeltner conducted wild parties where strip poker was played; that her son saw one man totally naked at one of these parties; that she moved in with her twenty year old boyfriend who had been smoking marijuana for four years and slept with him while the children were at home; that her children were aware that their mother was sleeping with a man to whom she was not married; that Mrs. Noeltner's minor brother was sleeping every night with a seventeen year old girl in the children's living room, and the children were aware of it; that both her brother and his girlfriend had been involved with drugs and committed a burglary while living with Mrs. Noeltner; and that Mrs. Noeltner gave birth to an illegitimate child fathered by her boyfriend. We feel her past actions demonstrate she is far less capable than Mr. Noeltner of exercising proper parental judgment or raising her children in a moral environment.

■ We firmly believe that the order granting custody of Tess to petitioner was wrong and against the weight of the evidence. *Murphy v. Carron*, supra. We re-

verse that part of the decree and order the custody of Tess granted to respondent.

 In petitioner's cross appeal she contends that the trial court erred in granting custody of Dana to Mr. Noeltner. We disagree for the reasons stated above. Accordingly, the trial court's order regarding the custody of Dana Noeltner is affirmed.

Mr. Noeltner also appeals the court's award to Mrs. Noeltner of $1.00 per year maintenance. At trial Mrs. Noeltner expressly waived her right to receive maintenance. She was asked if she was asking for separate maintenance or alimony and replied, "No, I'm not." She was asked if she understood that if she did not ask for maintenance at that time she could not later request it. She replied, "Yes, I understand."

 We hold that the petitioner expressly waiver her right to maintenance and the trial court erred in making the $1.00 a year award for maintenance. Accordingly, the order relative to maintenance is reversed.

The judgment is reversed and cause remanded with directions to enter a judgment in accordance with this opinion.

SNYDER, J. and ALDEN A. STOCKARD, Special Judge, concur.