Gregory Allan SAMUELS, Respondent,

v.

Ramona Alvarez SAMUELS, Appellant.

No. WD 37540.

Missouri Court of Appeals,
Western District.

July 29, 1986.

Thomas R. Summers, Utz, Litvak, Thackery, and Taylor, St. Joseph, for appellant.

Tim L. Warren, St. Joseph, for respondent.

Before SHANGLER, P.J., and DIXON and LOWENSTEIN, JJ.

SHANGLER, Presiding Judge.

The husband, Gregory Samuels, sued the wife Ramona Samuels for dissolution of the marriage. The wife brought a cross-petition, sought the custody of the two children of the marriage, support money for the children, a division of the marital assets, and an attorney fee. The court dissolved the marriage, granted custody of the children to the wife, awarded a sum for child support, and an attorney fee to counsel for the wife, but denied the request of the mother to remove the children from Missouri for residence. The wife appeals the order to deny the removal of the children to New York for purposes of residence, and the failure to enter an award for her maintenance.

Gregory Samuels met Ramona Samuels in Barcelona, Spain in 1977. He was in the military service, and she was a native of the country. They married a year later in the United States, and established a home in St. Joseph, Missouri. Two boys were born to the marriage, Jeremy, now five years of age, and Joshua, not yet two. She remains a citizen of Spain. The husband is employed at the Quaker Oats plant and earns $10.48 per hour for a usual 40–hour week. The wife worked at Barbosa as a cook, but not steadily. The husband drank

to excess frequently, and after about a year, discord developed between the couple. He worked an early-morning shift, so that they did not see each other regularly. He, in turn, was not pleased with her domestic performance, and arguments became common, and sometimes turbulent. He battered her on several occasions, so that she sought refuge in a shelter. It was while in the shelter that she gave birth to the second son, Joshua in November of 1984.

The wife made a visit to the parental home in Spain in 1982, and took Jeremy [then, the only child] with her, and remained there for forty days. The couple separated in October of 1984, the wife was then expectant. The child, Joshua, as noted, was born the next month at the shelter, where the wife resorted after the husband assaulted her. The husband refused her access to their home, so after four days in the shelter—and the advent of the second son—the wife moved into an apartment. [There was evidence, and the court found in the course of the discursive formulation of judgment, that the husband was enmeshed in a liaison with another woman.] The wife was without family in St. Joseph, or means, and the work at Barbosa was not sufficient to sustain her, so she went to live with her sister in Rhinebeck, New York. She remained there with the children for some six months. She made application for employment there, among them, to the Culinary Institute in Hyde Park, for work and instruction as a cook. She engaged in no remunerative employment during that period, however. She instituted an action in the courts there for custody of the children and for their support. It was in that manner that the husband learned of her address. The wife did not tell the husband where the children were, but sent him Easter card greetings on behalf of the children during that period. The wife returned to St. Joseph with the children, and the action for dissolution ensued.

The marriage was adjudged irretrievably broken, and dissolved. The marital property—the residence, a lot, and a jeep—were awarded to the husband, and the husband was ordered to pay the wife $6,000 as her share of the equity in the marital home. The wife was granted the custody of the two children—"with the specific limitation that [the wife] cannot remove the minor children from the State of Missouri"—and the husband was granted reasonable visitation right, as well as during the other times specified in the decree. The husband was ordered to pay $75 per week for the support of the children, and to pay counsel for the wife a fee of $1,400. The court decreed, also, that "no maintenance be awarded either party, as it has been waived by [the husband and the wife]."

The wife alleges two errors on appeal: (1) the order that the wife, as custodial parent, not remove the children from Missouri to New York for residence, and (2) the failure to award the wife maintenance.

The first contention, more amply stated, argues that—granted, the best interests of the child remains the paramount concern in any matter of custody—the enactment of § 452.377, RSMo Supp.1984, enables the principals to modify the decree of dissolution without a court decree, and so manifests a legislative policy to facilitate the removal of a child by the custodial parent from the state of rendition of decree. The wife describes the statute as the consummation of a gradual repudiation of the quondam policy to forbid removal of a child to another state [e.g. *Baer v. Baer*, 51 S.W.2d 873 (Mo.App.1932)] to the acceptance of a new policy—prompted by the reality of a society in motion—that does not rigidly confine custody to the state of decree [e.g. *Pender v. Pender*, 598 S.W.2d 554 (Mo.App.1980)]. That provision, enacted into the Dissolution of Marriage Act in 1984 as § 452.377, [RSMo Supp.1984] recites:

*A person entitled to the custody of a child shall not change the residence of the child to another state or remove the child from this state for a period of time exceeding ninety days except upon order of the court or with the written consent of the parties with custody or visitation rights. Where the noncustodi-*

al person has been given visitation rights by the custody decree, such court permission may be granted only after notice to the person having visitation rights and after opportunity for hearing. Violation of a court order under this section may be deemed a change of circumstance under section 452.410, allowing the court to modify the prior custody decree. [emphasis added].

The text, indeed, confirms the legislative intention to disencumber the courts from the duty to sanction, in every case, the removal of the child from Missouri for a prolonged time by the custodian, and allows that action upon the written concurrence of those with rights of custody or visitation. The decree entered, however, does not enable the wife to remove the child from Missouri, but expressly forbids it—nor was any written consent of the wife and husband formulated or presented. Thus, the initiative § 452.377 allows a custodian and others in interest to agree to a change in the residence of the child [and so "modify the dissolution decree without court order," as the wife aptly describes that feature of the law] was never exploited, and neither statutory condition for the removal of the child for residence in New York was met. *Craighead v. Craighead,* 710 S.W.2d 501 (Mo.App.1986).

The wife argues, nevertheless, that another intendment of § 452.377 *requires* the court to grant the custodial person permission to remove the child outside the state simply upon motion, provided only that the court adjust the visitation rights to accommodate that modification. The argument refers to the later component of § 452.377:

Where the noncustodial person has been given visitation rights by the custody decree, such court permission may be granted only after notice to the person having visitation rights and after opportunity for hearing.

That argument not only obtrudes against the obvious sense of the statute, but also disregards the judicial policy the enactment confirms, codifies and enlarges.

A child awarded into custody in a dissolution proceeding becomes a ward of the court. *State ex rel. Dubinsky v. Weinstein,* 413 S.W.2d 178, 181[1–5] (Mo. banc 1967). In the discharge of that stewardship, the court fashions its orders for the best interests of the child. *State ex rel. Shoemaker v. Hall,* 257 S.W. 1047, 1053[8] (Mo. banc 1924). The best interests of the child are best served by continued interrelationships with both parents. *Perr v. Perr,* 205 S.W.2d 909, 912[4] (Mo.App. 1947). It is that general premise that engendered the judicial policy to deny the removal of the child to another jurisdiction where the practical consequence was to deny the child reasonable occasion for contact with the other parent. *Pelts v. Pelts,* 425 S.W.2d 269, 270[1–3] (Mo.App.1968). The best interests of the child, nevertheless, may supervene to allow a custodian to remove the child to another state—even at the disadvantage or inconvenience of the other parent or person with the right of visitation. *Pender v. Pender,* 598 S.W.2d at 556. An order of custody which also grants to another the right of visitation, however, vests a right which is infringed by the removal of the child to another state for residence, so that the removal may constitute a change of circumstance for modification of the decree. *Leaton v. Leaton,* 435 S.W.2d 408, 411[1, 2] (Mo.App. 1968); *L——. v. D——.,* 630 S.W.2d 240, 241[2] (Mo.App.1982).

These principles of the adjudicative power in child custody cases—a historical and ancient inheritance—undergird the custody provisions of § 452.375 to 452.410 of the Dissolution of Marriage Act. The provisions of § 452.375, RSMo Supp.1984, confirm the power of the court to determine custody in a dissolution proceeding and codifies the judicial maxim that the award accord with *the best interests of the child.* § 452.375.2. Thus, also, the provisions of § 452.377 operate *in pari materia* to prevent the person entitled to custody from removal of the child to another state for more than ninety days or from the change of residence of the child *except* upon the order of the court or with the written con-

sent of the party with custody and the party with the right of visitation. It is implicit from the nature of the judicial task, as well as from the integral custody provisions *in pari materia*, that an order to allow removal under § 452.377 issues where the best interests of the child are subserved. It is implicit also that the formal concurrence of both the person with the right of custody and the person with the right of visitation suffices under that statute because the role of each has already been adjudged to promote the welfare of the child. § 452.375.2, § 452.400, RSMo Supp.1984.

■ The argument the wife makes, therefore, that § 452.377 *requires* the court to grant the person with custody permission to remove the child outside the state simply upon motion—whatever the impediment to the continuous relationship with the other parent or the innumerable other considerations which bear on the best welfare of the child—contradicts the desideratum of the statute. The argument the wife makes, moreover, goes against the logic of the statute altogether, that the child may be removed from the state by the person in custody *only* upon order of the court—that is, the adjudication of the court, or with the written consent of the persons with the right of custody and visitation. To require the court to grant the person with custody permission to remove the child simply upon motion, transmogrifies the two preconditions the statute articulates immediately before—either an adjudicated order or a joint concurrence of the persons in interest—into a unilateral and incontestable mandate.

■ The wife argues that, in any event, the denial of her request to remove the children to New York for residence does not subserve her interests, and hence the welfare of the children, Jeremy and Joshua. She argues, as she did to the trial court, that she is without family or friends in St. Joseph, and that opportunity lacks there. She contends she is trained only for labor, so that to remain there would be to consign her to "the lower economic level,"

whereas in New York the opportunity for culinary instruction, as well as employment, promises a greater reward. This reward, she argues, would benefit the children. Also, she and the children had a residence with the sister in Rhinebeck while she learned and worked, so that "although the children would be a long distance from their father, the positive effects of a move would far outnumber the negative ones so far as the children are concerned."

The comments of the trial judge given in rendition of the judgment suffice in response. The court first announced that "the primary concern [was] the best interests for the children," and then ruled:

I can appreciate your feelings of being on an island here, but you have more friends than you may imagine. I have heard a lot of divorce cases over the years, and frankly, you have got more witnesses who will come up and testify for you than most women I have who come in or men either one for divorce cases. So I think you may have more friends than you think, and those children are too young to travel back and forth and for you to move to New York with these children would—I could order them to come back here every three or four months on an airplane, a terrible expense, and still wouldn't be the same as growing up knowing their father.

The plans you have for New York from your testimony are too speculative for me to feel comfortably that you really have a good setup back there. You are going to live with your sister and her family, but I don't know how long that would last, and I imagine that after a time it would cause some problems in that household, and you don't have a definite job. I think it would be best if you stayed here with the children, so I am going to deny you the right to remove the children to the State of New York.

The evidence was, indeed, that during the six months sojourn in New York, the wife applied for employment, but never

worked. It was her testimony that she then had an offer from the Culinary Institute of America for employment, but that was uncorroborated. The conclusion by the trial court that her plan for subsistence in New York—in terms of employment and residence with the married sister—was too speculative an experiment, and hence, not in the best interests of the children—was supported by the record. The evidence was also, on the other hand, that she was a valued worker at Barbosa, and nothing suggests that work opportunity was not still open to her. It was a permissible inference, moreover, that the opportunity to advance her economic status by instruction in nursing [an objective, she testified, denied her by the husband] was also open to her. The evidence was also that the children were young: Jeremy was then five, and Joshua not yet two. It was that consideration, as well as the uncertain future which faced the mother in New York, which prompted the refusal to remove the children. It is evidence that the decision was prompted by the concern for the best interests of the children on the basis of the circumstances shown to the court:

> I'm not going to keep her here forever. If she gets married and moves somewhere else or whatever things happen in the future, but as of this time, the Court finds from the age of these children that it would not be in their best interests that they be allowed to move to the State of New York.

The decree of custody is affirmed.

The wife contends also that the failure of the court to order maintenance was error. The entry of judgment recites, simply, that "no maintenance be awarded to either party, as it has been waived by Petitioner [husband] and Respondent [wife]." The wife acknowledges that waiver was tendered, but on condition that the court grant her the move to New York with the children—a request not allowed.

■ A court may grant a maintenance order to a spouse where (1) the marital property already apportioned considered, the spouse lacks sufficient property to pro-

vide for her reasonable needs, and (2) is unable to support herself through appropriate employment. § 452.335.1, RSMo 1978. An award for maintenance which does not rest on a pleading, or on a trial of the issue by consent, or on substantial evidence, does not stand. *Goodrich v. Goodrich*, 667 S.W.2d 39 (Mo.App.1984). A claim for maintenance, moreover, may be waived. *In re Marriage of Noeltner*, 569 S.W.2d 8, 11 (Mo.App.1978).

The husband argues, and the court found, that the wife waived any claim to maintenance. The husband contends waiver from an express trial declaration of the wife. *In re Marriage of Noeltner*, 569 S.W.2d 8 (Mo.App.1978) rules that a claim to maintenance may be waived by simple acknowledgment at the trial that the spouse sought no such award and understood that the waiver precluded subsequent request. *Walker v. Walker*, 631 S.W.2d 68 (Mo.App.1982) reversed an award for maintenance where the spouse testified she did not need maintenance and her counsel confirmed to the court that she did not want maintenance. The reversal of award was premised not on waiver, however, but as against the weight of the evidence. In *Payne v. Payne*, 616 S.W.2d 97 (Mo.App. 1981), the court sustained an award of maintenance despite a waiver declared in open court. The opinion recites merely that the review was under Rule 73.01 which directs the court "to consider both the law and the evidence"—and concluded that the award of maintenance was not erroneous. Then, *Layton v. Layton*, 673 S.W.2d 462 (Mo.App.1984) undertook to accommodate these, and other diverse strands of opinion—all decisions of that court, the Eastern District—as to the efficacy of an express waiver of maintenance, and concluded, at 463[2]:

> These decisions clearly reflect that the trial court is not bound by stipulation, agreement or waiver regarding maintenance, but rather the court must exercise its discretion to determine the granting or denial, the amount and duration of

maintenance as guided by the factors set forth in § 452.335.2, RSMo 1978.

We would disagree, if disagreement were necessary, that the waiver to maintenance of a person *sui juris* and otherwise competent to look after a personal interest does not bind a trial court, and must be refused, as a corollary to the duty reposed by § 452.335.2, as *Layton* expounds. That subsection 2 operates only when the right to maintenance has been proven, and defines the factors the court considers to determine the amount of award.[1] An award of maintenance, however, issues only to a spouse who *seeks* maintenance.[2] The declaration in *Layton* that "the trial court is not bound by any stipulation, agreement, or waiver regarding maintenance," moreover, contradicts the purpose of § 452.325 which enables parties to a dissolution to enter a written separation agreement in order to "promote the amicable settlement of disputes"—a dispute as to a right to maintenance, included. A waiver of maintenance under such an agreement binds the court. *In re Marriage of Wilfong*, 658 S.W.2d 45, 48[8, 9] (Mo.App.1983). A waiver of a claim to maintenance made in open court voluntarily and understandingly operates to the same end as the agreement enabled by § 452.325—it promotes judicial efficiency without any disparagement of equity or justice—and hence should be given effect at a trial.

■ We conclude from a review of the record, however, that there was no waiver by the wife, and that the judgment of the court to deny maintenance on that ground was an error of law, and must be reversed. *Atwood v. Atwood*, 664 S.W.2d 673 (Mo. App.1984). The adjudication does not determine by finding how the waiver was accomplished, nor allude to the evidence to sustain the order of denial. Only one trial episode impinges on that issue, a brief colloquy between counsel and the wife on direct examination:

Q. As I understand, you believe you have employment in New York?

A. Yes, I do.

Q. *So for that reason, you are not asking for alimony or what we call maintenance; is that correct?*

A. No.

Q. And you understand that if you don't get that now, you can never get it from Mr. Samuels. Do you understand that?

A. Yes.

Q. And I don't remember if I asked you this, but you are asking for your attorney's fees; is that correct?

A. Yes.

Q. Now, are you wanting—*do you understand that you cannot go to New York personally with the children unless Judge Connett says you can. Do you understand that?*

A. Yes, I understand. [emphasis added]

It is evident that the tender of waiver of maintenance was on condition that the court grant her the move to New York with the children. That was because employment was ready for her there with the Culinary Institute. The court denied the request, however, and the employment opportunity lapsed with that denial. Thus, neither the premise for the tender of waiver of maintenance: an employment already secured, and the condition: that the court allow her to remove the children to the place of employment, New York, were validated by the decision of the judge—on which the entire scheme of waiver depended, and no waiver of the issue was accomplished. *Walker v. Walker*, 631 S.W.2d 68 (Mo.App.1982); *In re Marriage of Noeltner*, 569 S.W.2d 8 (Mo.App.1978).

---

**1.** Section 452.335.2:

The maintenance order shall be in such amounts and for such periods of time as the court deems just, and after considering all relevant factors including: ....

**2.** Section 452.335.1:

[T]he court may grant a maintenance order to either spouse, but only if it finds that the spouse *seeking* maintenance.... [emphasis added]

It remains for us to enter the order the trial judge should have entered under the evidence adduced on the issue and on the law. *Kenny's Tile & Floor Covering, Inc. v. Curry*, 681 S.W.2d 461, 465[1, 2] (Mo.App.1984).

The *sine qua non* of an award for maintenance under § 452.335, RSMo 1978, is need. The spouse who seeks an award for maintenance must prove the lack of sufficient assets—the marital property already apportioned considered—to meet her reasonable needs, and that she is unable to support herself through appropriate employment. The burden to prove the issue is on the spouse to assert the claim. *Cunningham v. Cunningham*, 673 S.W.2d 478, 480[1–4] (Mo.App.1984). There was evidence that the marriage had accumulated $13,000 in assets: a lot, a residence, and a jeep. The marital debt was $1,000. The court ordered the husband to discharge the debt, and then allocated to the wife one-half of the value of the marital assets, or $6,000, and entered judgment in that sum to her favor. Thus the asset apportioned to the wife was a judgment for $6,000. There is no evidence that the husband had any liquid resource from which to satisfy the judgment or upon which the wife could execute. It was evident that at the time of judgment, the wife was without funds altogether, and without gainful employment. She occupied the home residence with the children, but that marital property was allocated to the husband, and the wife was obliged to find other living quarters for herself and the children within sixty days. The court, moreover, expressly left it to the principals to agree on some immediate payment on the judgment: "I am sure if he can pay her two or $3,000 on the judgment and pay the judgment then she will have the money to go somewhere." There is nothing in the record that any agreement was accomplished. There is inference only that the wife was personally destitute and that the judgment for $6,000 as her distributive share of the marital property was of no immediate benefit to subserve her personal needs. Thus, the first prerequisite for maintenance [§ 452.335.1(1)]—that the spouse "lacks sufficient property, including marital property apportioned to [her], to provide for [her] reasonable needs"—was proven.

The second prerequisite for maintenance [§ 452.335.1(2)]—that the spouse "Is unable to support [herself] through appropriate employment"—was also proven. The wife was fit for employment, but at the time of the dissolution judgment, was unemployed. She is young and in good health. She is a skilled cook and a good worker. [It is no doubt because of her aptitude for that vocation that the Culinary Institute at Hyde Park, New York, invited her for instruction and employment.] Intermittently during the marriage, she was employed at Barbosa as a cook, and her work was very satisfactory. Her first stint there was at full employment, at the minimum wage, shortly after the marriage. That stint was interrupted by the birth of the first child, Jeremy, but she resumed the work thereafter on a part-time basis. She discontinued the Barbosa employment again to bear the second child, Joshua, and was in a shelter—where she took refuge from his abuse—when that child was born. She has not worked since. She was not aware whether Barbosa was still open to her. We assume, nevertheless, that no impediment precludes one so amply endowed with youth, talent, and vitality, with eventual employment in the vocation. Whatever the incidence of that inevitable occurrence, it is evident that at the time the judgment was rendered, the wife was unable to support herself from employment. The proofs indeed gave sparse attention to the particular expenses which constituted the needs of either the wife or the husband. It is evident, however, that the wife was without ready funds or ready means to earn funds, so that any personal need was beyond her capacity to requite. The *need* for maintenance under § 452.335 was proven. *Lewis v. Lewis*, 637 S.W.2d 207, 210[7] (Mo.App.1982).

The question remains as to the amount of the maintenance award and the period it shall run. In that determination, the finan-

cial resources of the spouse who seeks the award, the marital property already allocated, her ability to meet needs independently and the ability of the other spouse to pay—among the numerous other factors of § 452.335.2. The need the wife proves is for maintenance during the transition from unemployment to employment—and, since the $6,000 judgment is the only resource available to her—the transition from the judgment as a formal asset to an expendable asset. It bears emphasis that at the time of the dissolution the wife was bereft of any money or property and that the husband, now charged with the payment of $6,000 as the monetary equivalent of the marital property allocated to the wife, owned only the residence and the job. His equity in the residence was substantially less than $6,000, and his wages were earned by the week. Thus, the money allocated to the wife as her share of the marital property was not expendable at the time of the judgment and therefore she was without financial resources to meet her immediate needs [3]—one of the explicit factors § 452.335.2(1) requires a court to consider in the determination of the amount and duration of an order of maintenance.

A correlative consideration the statute imposes is the ability of the other spouse to pay. The husband earned $25,644.92 in wages in year 1984, and $23,570 in year 1983, according to the tax returns. The net wage, per week, amounts to somewhat more than $300, and from that $43 is deposited into the employer credit union for savings [an account all but depleted at the time of the dissolution.] The expenditures claimed by the husband are not fully developed, but $250 per month was mentioned as the cost of the dwelling, and $20 per week as his expenditure for beer. Whatever other expenses the husband could legitimately claim—and none others were asserted—an award to the wife as maintenance in the sum of $20 per week—the cost of the supply of beer—would deny the husband no necessary. The wife shows no resistance

to a role of employment and self-sufficiency. The award of maintenance we now enter, for $20 per week, of course, is open to modification. *Doerflinger v. Doerflinger,* 646 S.W.2d 798 (Mo. banc 1983).

The judgment is affirmed in part and reversed in part. The judgment of dissolution is modified to award the wife the sum of $20 per week as maintenance. The costs of the appeal are assessed against the husband.

All concur.

---

**3.** The judgment awards the mother $75 per week for support of the children given to her custody, but that amount—even if sufficient for that purpose—does not bear on her personal need, the prerequisite for an order of maintenance.