B.J.H., Petitioner–Respondent,

v.

L.H., Respondent–Appellant.

No. 16247.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 17, 1989.

No appearance, for petitioner-respondent.

Todd F. Thorn, Willow Springs, for respondent-appellant.

MAUS, Judge.

In this dissolution action, the circuit court placed two children in the custody of the wife. It granted the husband "reasonable visitation rights." In this appeal, the husband contends this action of the circuit court was erroneous and that the children should be placed in his custody.

Each party was represented by counsel in the circuit court. The husband's counsel filed an appellant's brief, with a one-page statement of facts, and withdrew. The wife has not filed a respondent's brief.

"Failure of a respondent to file a brief is an imposition on this court and leaves us dependent upon appellants' presentation and our own research. However, because no penalty is imposed by statute or rule, we will proceed to determine the case on its merits."

*Scheble v. Missouri Clean Water Com'n*, 734 S.W.2d 541, 545 (Mo.App.1987). This task is made all the more difficult because the evidence developed at trial dealing with the "factors determining custody", § 452.375, is scant.

The following is an outline of the most salient undisputed evidence. At time of trial, J.H., a male child, was 11 years of age. He was born to the wife and one P.R. The wife subsequently married S.C. A.H., a female child, age 8 at the time of the hearing, was born to the wife and S.C. S.C. adopted J.H. The record demonstrates that S.C. abused the children.

The wife married husband, L.H., on May 13, 1984. Appellant, L.H., is referred to as "the husband" in this opinion. The husband adopted both children. The husband and wife separated in March 1987. The wife said the separation was because "we didn't get along and he was goin' to bars a lot...." The wife and children moved in with her grandparents. Between the separation and time of trial, the wife had moved an additional six times. At the time of trial, she and the children were again living with her grandparents. The grandparents' four-room home was in a rural area. It had one bedroom. The wife and children slept in the front room. The grandfather was disabled because of emphysema.

The wife's work history consisted of six weeks' employment at a shoe factory and a few week's employment caring for an elderly gentleman. She did not seek employment after the separation. She testified that when she moved to Mountain View, she could get a job in a manufacturing plant. There was no evidence concerning the job, the salary, possible living accommodations or other anticipated circumstances for the children. The wife and children had subsisted on public assistance and contribution by the husband. For several months prior to trial, as a result of an administrative order, he had been paying the wife $275.00 per month.

From October 1987 for approximately one year, the wife denied the husband visitation with the children. This apparently was because of the husband's failure to agree to certain proposed terms for the dissolution. At the suggestion of the social worker, she permitted the husband to resume visitation.

As stated, during the separation, the wife had moved seven times. She said, "It's because of the welfare office. They didn't like the places I lived in." Those places are not well described in evidence. One was apparently in public housing. Others were in rural areas. Two houses in which she and the children lived had no running water.

At one time, V.B., a female friend of the wife's, lived with the wife and the children. For a reason not explained in evidence, one night, "real late", J.H. was locked out of the house. He returned with a friend to get his bicycle. "[W]e did look through the window and they was dancin' with their

shirts off." He was referring to the wife and V.B.

K.S. was a 14 year-old boy who at one time was a neighbor of the wife. He testified concerning his sexual escapades with the wife. At the suggestion of his stepfather, he went to her house and, following further suggestions made by the stepfather, had sex with the wife. He said four or five days later he and a friend, C.G., age 15, went to the wife's house. They successively had sex with the wife. The stepfather had provided K.S. with a tape recorder. He recorded at least a portion of the sexual activities. K.S. testified that on one occasion J.H. was at home and on the other occasion both children were in the house. J.H. testified that he knew that K.S. and C.G. stayed all night.

K.S. further testified that on a later occasion the wife came to his home because she was kicked out of where she was living. Her children were with her. The wife was a friend of his mother and father. There the wife had sex with K.S. and another boy, B.B., while the stepfather watched. K.S. heard his stepfather threaten to take the tape to the welfare office. At the time of trial, K.S. and his sister were in protective custody because the stepfather had abused the children.

The wife admitted the sexual episodes in her house. She said she did so because the stepfather threatened to hurt her children. She did not further explain when the threat was made or explain the circumstances under which it was made. She further testified that later, when she was walking to town, the stepfather picked her up and took her to his house. He threatened that if she did not treat the boys right, he would take the tape to the welfare office. She again had sex with two boys. She said she did not report any of these activities to the authorities because the stepfather had threatened to hurt the children. The record demonstrates that the wife had been in a "stress unit" in a hospital. She was referred to the hospital by a social worker because of circumstances involving the stepfather.

During the marriage, the husband and wife had lived in a rented house with the husband's father. The husband helped with the children and engaged in activities with them. After the separation, the husband moved to a larger rented house. At the time of the trial, he lived there with his father and his sister. His sister was retired or discharged from the military service. The house had seven rooms, including three bedrooms and a utility room and family room which could be made into bedrooms. Since the separation, the husband had dated a 22 year-old girl, C.M. He had sex with her. She occasionally stayed the night in the house and upon occasion when the children were visiting.

The husband had been steadily employed. At the time of trial, he had worked for an automobile dealer as a mechanic for approximately four years. His take-home pay was $800 per month. At one time, he played in local bands on weekends. He testified that he wanted custody of the children. He was able to care for them. He described his activities with the children. The wife admitted the husband and the children had a "fairly good" relationship.

J.H., the oldest child, testified. His testimony concerning the dancing incident and presence of the two teenage boys has been noted. He knew that C.M. stayed all night in the husband's house. He said his dad had dirty movies in the house. He and a friend got one once. Upon discovering what it was, they put it back. He preferred to live with the husband. He described the grandparents' house as dirty. He quarrelled with the wife, but except for that got along with her. He said, "And my Dad, we go together pretty fine." The "dirty movies" were not further described. The husband was not called upon to explain what they were or the reason for their presence.

The issue presented by the husband's appeal is whether or not the judgment placing the two children in the custody of the wife is against the greater weight of the credible evidence.

"The standard of review enunciated in *Murphy v. Carron*, [536 S.W.2d 30, 32[1–3] (Mo. banc 1976)] supra, is applicable to determinations of custody. *B.___ v. L.___*, 558 S.W.2d 738 (Mo.App. 1977). The intangible factors involved make it peculiarly appropriate. *Fastnacht v. Fastnacht*, [616 S.W.2d 98 (Mo. App.1981)] supra. However, the doctrine of that case cannot be invoked to impede a critical appellate review of such a determination."

*R v. R*, 685 S.W.2d 598, 601 (Mo.App.1985). In that critical appellate review, this court must be guided by established legal principles that include the following.

"While the wish of the child is a factor to be considered by the court, it is but one factor. It is not conclusive, but is to be weighed with all other relevant factors."

*Ikonomou v. Ikonomou*, 776 S.W.2d 868, 870 (Mo.App.1989).

"Second, the child's interests and welfare predominate over all other considerations in a child custody matter. *E.C.S. v. J.D.L.*, 529 S.W.2d 423 (Mo.App.1975); *Noland v. Noland*, 527 S.W.2d 696 (Mo. App.1975). We also recognize that the moving party—in this case, the father—has the burden of showing a change of conditions necessitating the transfer of custody. *Northrup v. Sieve*, 517 S.W.2d 470 (Mo.App.1974).... And, certainly, moral fitness of the parents is a matter of prime concern for the court in determining who should have custody of a child."

*L.W. v. G.W.*, 534 S.W.2d 826, 829 (Mo.App. 1976).

"Although sexual misconduct may not be sufficient in and of itself to deprive a parent of custody of the children, morals are a pertinent factor to be taken into account in determining whose custody will serve the best interests of the child."

*Hartig v. Hartig*, 738 S.W.2d 160, 161 (Mo. App.1987).

"The moral fitness of a parent is a vital factor in determining who should have custody of a child."

*In re Marriage of Noeltner*, 569 S.W.2d 8, 10 (Mo.App.1978).

The choice between custodians confronting the circuit court was a poor one. The father apparently had in his house what J.H. considered a "dirty movie". His girlfriend spent the night when the children were in the house. But, the father lives with his father and sister who are available to help with the care of the children. They live in a seven-room house which can afford the children privacy. The husband has been steadily employed at a responsible job. The wife admitted the husband had a good relationship with the children.

On the other hand, the episodes related in evidence provide an adverse demonstration of the wife's character. She did not deny that she locked J.H. out of the house late at night and then engaged in topless dancing with her female companion. She admitted she had sex with teenage boys under degrading circumstances. She indirectly exposed her children to such activities. She offered alternate excuses for such conduct. First, she did so because the stepfather threatened to harm the children. Second, she engaged in the third episode because he threatened to expose the tape to the welfare department who would take her children. The later threat was confirmed by K.S. K.S. had no knowledge of any threat before the first two encounters. That the wife submitted on the first two occasions because of the unexplained threat strains credulity. It is belied by the plot to obtain the tape and use it to cause the wife to have sex with the boys in the stepfather's presence. If such sexual activity was the result of duress, she failed to report it to the authorities. Overall, her conduct demonstrates a lack of morals and judgment. She has been content to live without working. She has moved seven times in less than two years. At the time of trial, she was living under adverse circumstances. She plans to move again with no explanation of the circumstances in which she will live and to which the children will be exposed.

The situation of the children is much like the situation of the child summarized in a recent case.

"He will now begin to learn to associate with and accommodate the mutual rights and privileges of his peers and will acquire some notion of those qualities known as the elementary virtues, including industry as opposed to indolence, honesty or at least reasonable candor as opposed to duplicity and prudent restraint as opposed to unlimited self-indulgences."

R___ v. D___, 667 S.W.2d 41, 43 (Mo.App. 1984).

As stated, the evidence bearing upon the best interests of the children has not been well developed. The record before this court does not present one factor favorable to custody by the mother. It is possible there are factors bearing upon that issue not presented by the record. Facts unknown to the court may serve as the basis for a motion to modify. *L.H.Y. v. J.M.Y.*, 535 S.W.2d 304 (Mo.App.1976).

This court is directed that "[u]nless justice otherwise requires, the court shall dispose finally of the case." Rule 84.14. The paucity of the evidence does not establish such an extraordinary case that demands an exception to this rule.

"We are authorized to set aside a judgment in a bench-trial case on the ground that it is against the weight of the evidence only when the record generates a firm belief that the decree or judgment is wrong. *This is, nevertheless, such a case.*"

R___ v. D___, 667 S.W.2d at 42 (emphasis added). Cf. *L.W. v. G.W.*, supra.

That portion of the judgment of the circuit court placing the children in the custody of the wife and awarding her child support is reversed. Judgment is entered that the two children are placed in the custody of the husband, with the wife to have reasonable visitation.

FLANIGAN, P.J., and HOGAN, J., concur.