Robert Alan CORNELL, Petitioner–Respondent,

v.

Stacey Lynn CORNELL (now Zippro), Respondent–Appellant.

No. 16819.

Missouri Court of Appeals, Southern District, Division Two.

May 21, 1991.

---

Bruce N. Secrist, Joplin, for petitioner-respondent.

Robert P. Warden, Joplin, for respondent-appellant.

MAUS, Judge.

The Decree of Dissolution dissolving the marriage of Robert Alan Cornell (husband) and Stacey Lynn Cornell (wife) entered on June 4, 1987, placed the primary custody of their daughter, Chandler Marie Cornell, then age 21 months, with the wife. Husband was awarded reasonable visitation, including temporary custody every other weekend from 5:00 p.m. on Friday to 5:00 p.m. on Sunday, three weeks during the summer and alternate major holidays and birthdays. On January 16, 1990, the trial court sustained husband's motion to modify and placed primary custody of the daughter with husband. Wife was awarded reasonable visitation and temporary custody from June 10 through August 31 of each year; anytime wife is in Jasper County, Missouri, for a period not to exceed three days at a time; Christmas Day plus five days on even numbered years; the period of Spring Break from school; and Thanksgiving Day, plus three days on odd-numbered years. The decree also provided "every other weekend from 6:00 p.m. Friday to 6:00 p.m. Sunday, beginning January 19, 1990, which may be exercised by maternal grandparents when the Respondent is unavailable." The trial court denied wife's counter motion to modify. Wife appeals.

At the time of the dissolution, the parties lived in the Jasper County community. The families of both the husband and wife live in that community. Husband was employed at a meat company. Wife was employed at a paint store.

On December 31, 1988, husband married Latricia. Latricia has a daughter ten months older than Chandler. Husband changed employment to work for Manpower. Latricia is also employed. Husband and Latricia live in a two-bedroom mobile home in Webb City.

On September 16, 1989, wife married John Zippro. Wife and Chandler moved to Doraville, Georgia, where John Zippro is employed as a custom drapery designer and installer. The couple will live in Doraville in a two-bedroom home owned by John Zippro. At the time of the hearing, wife

was unemployed and did not plan to return to work immediately.

On May 31, 1989, husband filed a motion to modify the decree of custody to award him primary custody. For grounds, he alleged he had remarried and could provide a more stable home environment; wife had regularly deprived him of his right of reasonable visitation as set forth in the dissolution decree; and wife had attempted to alienate the daughter from her father. Wife filed a denial and a counter motion seeking an increase in child support. The morning of the hearing, wife filed an amended counter motion seeking the additional relief of permission to move the daughter to the state of Georgia.

Wife's first point is the trial court erred because there was no evidence of a substantial and continuing change of conditions that would justify modification of custody and the decree of modification was against the weight of the evidence. Her second point is that the trial court erred in modifying the decree of custody because even if there were substantial and continuing changed conditions, they did not so adversely affect the daughter to cause it to be in her best interests to be placed in the primary custody of husband. The second point is substantially a rescript of the first point. The essence of wife's two points is that the evidence is insufficient to support the decree of modification.

The evidence supporting husband's allegations include the following. Following the divorce, husband and wife followed the visitation provisions without incident until husband began seeing his present wife, Latricia. In addition to the periods of visitation provided for by the decree, wife had allowed husband visitation on Tuesdays while wife was at work. Beginning in March of 1988, however, when he first met Latricia, husband was denied the Tuesday visitation periods he had previously enjoyed. Wife began to construe the custody provisions strictly and allow only those periods in the decree.

Husband testified that he had been denied visitation by wife between six and twelve times since the divorce, and described three incidents in detail. On May 5, 1989, husband received the following note from wife:

"Alan, please do not come after Chandler for a while.

She is under a doctor's care and she is not well. When the doctor releases her and says it is in Chandler's best interest to see you, then I will let you know.

Please do not come to my house or my parents until you are notified that Chandler is alright.

Thank you!"

On June 30, 1988, wife took daughter to Florida on vacation when husband was scheduled to have visitation.

On December 31, 1988, husband married Latricia, without telling wife of the plans, on an evening when they had custody of the daughter. Following the marriage, husband requested visitation on January 19, 1989, but was refused. Wife wrote him saying " 'Now here it is January 19, 1989, not a day for you [sic] have visitation, yet you still have the nerve to call me and ask if you can have Chandler for a couple of hours.' " At one time wife told husband's lawyer that she did not feel like husband needed visitation.

In 1989, husband's three-week-long summer custody was scheduled to begin on June 13. Wife told husband that that time would not be suitable for husband to begin his temporary custody. She later wrote husband he could not have summer visitation until the whole modification problem was cleared up. He did eventually have temporary custody in August.

A few days before the scheduled weekend custody of December 2, 1988, husband had requested having the daughter for the night. This was a night the daughter usually stayed with her grandparents while wife went bowling. Wife said she asked the daughter if she wanted to go with her father and she did not. Husband replied that he would no longer ask to have the daughter during the week, which was misinterpreted by wife to mean he did not want to have the daughter at all. As a result, on the weekend of December 2,

when husband did not appear at the scheduled time, wife assumed husband did not want to take the daughter and went to her parents' house with the daughter. Husband arrived at wife's home some time later to pick up the daughter and no one was home. When he went to wife's parents' house and requested his daughter, wife refused and an argument ensued in front of the daughter. Wife's father testified it was his decision not to let the daughter go with husband that night.

Husband testified that he had been forced to respond to two separate unsubstantiated reports of abuse made to the Missouri Department of Family Services. In addition, wife had gone to husband's work place over twenty times since their divorce.

Husband's gifts and cards to the daughter were returned with the admonition that he should not send any more because they would go in the trash. Latricia's mother testified that wife told her Chandler didn't realize that husband was her Dad; she just thought he was someone with whom she spent every other weekend.

Wife denied some of this evidence and offered excuses and explanations for other portions. She said that husband and Latricia lived together before they were married and the daughter was in his weekend custody during that period. She testified that she saw husband hit Chandler in November 1987 and that husband made Chandler sit at the table when she did not eat her oatmeal. Chandler told wife that husband was mean and slaps her, hits her with a belt and will not let her wear her own clothes but she must share her clothes with her stepsister. Wife further testified that on occasion Chandler came home with unexplained bruises and, one time, with a swollen foot. She said Chandler cries when she goes to visit husband and suffers from an impediment of speech and wets the bed when she returns from visiting.

Wife testified that husband has an uncontrollable temper. She recounted an incident when, on the advice of her counsel, she asked husband if he would consent to wife and the daughter moving to Florida.

The result was an incident during which he became very upset and the police were called to the scene. She also said the separate incident at her parents' home, because of husband's rage, upset the daughter.

She testified that husband's visitation should be supervised. "A juvenile officer or someone unbiased and an authority that can make sure and see that he's watching and taking care of her properly the way she should be." Her testimony also included the following: "Q. If the Court feels that it's in Chandler's best interest for her to leave Jasper County and go to Georgia, what do you propose with respect to Alan's visitation? A. That any visitation that he is granted to have today be supervised." She later added that if the court ordered unsupervised visitation, she would comply.

On December 31, 1988, husband asked for the daughter so they could go to Bass Pro. Husband lied. Chandler came home and told wife of the wedding and that husband and Latricia were going to have a baby. Wife also testified that she had "never run husband down in front of Chandler." She stated that she had told Chandler that her daddy loved her. Wife bought gifts and cards on holidays for him from Chandler, and had sent him balloons and flowers from Chandler on his birthday. She said she did deny husband's period of temporary custody beginning on June 13, 1989 for three reasons. She said "I want to say she had a doctor's appointment ... I know I had three, what I thought, were valid reasons why she could not go on that particular weekend, but I don't know exactly what they are now." She explained that Chandler would not play with the balloons nor eat the candy husband had sent, so she returned them along with his cards.

At the conclusion of the hearing on October 27, 1990, the trial court took the matter under advisement. At that time, the trial court engaged in an extended dialogue with the parties and their lawyers. In this dialogue, the court demonstrated great insight into the attitudes of the parties and their conduct. It provided them with a sagacious pattern for their future behavior to aid in the adjustment and development of

their daughter. The dialogue reflects the trial court's concern for the best interests of the daughter.

During the time the matter was under advisement, the daughter was placed in the temporary custody of her father, subject to visitation by the grandparents and sporadic periods of custody by wife when she was in the community. The parties were directed to engage in family counseling with an independent counselor agreed upon by them. They complied by counseling with a licensed clinical psychologist. Each party saw the psychologist separately and with the daughter. The psychologist separately interviewed the daughter. The three were also seen as a group. The psychologist gave a comprehensive report to the trial court and the parties. The report included findings on the personality traits of each party, as well as the development of the child. He observed that husband, when reaching a frustration point, reacted inappropriately but he did not seem to be out of control or act detrimentally to the daughter. He reported, "Chandler indicates that she enjoys spending time with both of her parents and is fond of her stepsister, Brittany." His conclusion included the following:

> "There are no personality defects or flaws noted within either of these parents which would be deemed appropriate to be taken into consideration with attempting to decide custody and visitation with regard to the four year old child. Based upon observational opportunities within this office Chandler is comfortable with her relationships with both parents."

Following the report, the trial court was informed that neither party desired to offer further evidence. On January 16, 1990, the trial court entered the decree of modification.

In its review of the decision of the trial court, this court must be guided by well-established principles. That includes the following:

> "The trial judge is in a superior position to determine and evaluate the credibility, sincerity and character of all witnesses." *Ellis v. Ellis,* 747 S.W.2d 711, 715 (Mo. App.1988).

■ In child custody proceedings, the determination of the trial court is given greater deference than in other cases.

> " 'The standard of review enunciated in *Murphy v. Carron,* [536 S.W.2d 30, 32[1–3] (Mo. banc 1976) ] supra, is applicable to determinations of custody. *B.____ v. L.____,* 558 S.W.2d 738 (Mo.App. 1977). The intangible factors involved make it peculiarly appropriate. *Fastnacht v. Fastnacht,* [616 S.W.2d 98 (Mo. App.1981) ] supra." *B.J.H. v. L.H.,* 779 S.W.2d 777, 780 (Mo.App.1989).

"However, the determination of the trial court in regard to child custody is granted greater deference than in other types of cases." *Hart v. Hart,* 766 S.W.2d 131, 132 (Mo.App.1989).

Also see *Grams v. Grams,* 789 S.W.2d 846 (Mo.App.1990); *Hord v. Morgan,* 769 S.W.2d 443 (Mo.App.1989); *Kean v. Kean,* 754 S.W.2d 922 (Mo.App.1988).

■ "It is the policy of this state to encourage the continued interest, love and affection of divorced parents for their children and to afford children ample opportunity for close contact with both parents. *Tucker v. Tucker,* 778 S.W.2d 309, 313 (Mo.App.1989)." *Amedei v. Amedei,* 801 S.W.2d 491, 494 (Mo.App.1990). "Interference by one parent with the decretal rights of visitation of the other constitutes ' "a changed condition which may justify and require a modification" ' of custody provisions of a divorce decree.' *H____ v. H____,* 637 S.W.2d 432, 434[4] (Mo.App.1982). To similar effect see *Knoblauch v. Jones,* 613 S.W.2d 161, 167[5] (Mo.App.1981); *Randle v. Randle,* 560 S.W.2d 876, 879 (Mo.App. 1977)." *O'Loughlin v. O'Loughlin,* 712 S.W.2d 450, 452 (Mo.App.1986). "This state of facts showing an attempt by one parent to alienate a child from the other parent is a changed condition and can form the basis for a modification of custody, *Eatherton v. Eatherton,* 725 S.W.2d 125, 128 (Mo.App.1987). When a parent who has custody makes disrespectful and abusive statements against the other parent and attempts to wean the children away, the decree can properly be modified and the custody changed. *Garrett v. Garrett,* 464 S.W.2d 740, 743 (Mo.App.1971)." *Gentry*

*v. Simmons,* 754 S.W.2d 579, 582 (Mo.App. 1988).

■ The possible removal of the daughter from her home community is also a factor which may be considered in determining what is in the best interests of the child. *Knoblauch v. Jones,* 613 S.W.2d 161 (Mo.App.1981).

The evidence has been summarized above.

"[T]he principles of *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976) control the present appeal. Therefore, the decision of the trial court will be upheld unless there is no substantial evidence to support it or it is against the weight of the evidence. Id. The trial court's judgment will be set aside by this court only if there exists a firm belief that the judgment is wrong. Id. See also, *Pulliam v. Sutton,* 728 S.W.2d 252, 254 (Mo.App. 1987)." *Amedei v. Amedei,* 801 S.W.2d at 492.

■ "No findings of facts or conclusions of law were made in this case, thus all facts are deemed found in accordance with the result reached." *Ellis v. Ellis,* 747 S.W.2d at 714. The trial court was not required to accept the denials, excuses, or charges offered by wife. It obviously did not do so. There was substantial evidence to support a finding that wife followed a pattern of interference with the visitation and temporary custody granted to husband. There was evidence from which the trial court could conclude wife was attempting to alienate the daughter from husband. The change in circumstances of a move to Georgia was acknowledged. The trial court was in a position to assess the import of the evidence in light of the intangibles involved and reach a judgment concerning the best interests of the child. This court does not have a firm belief that judgment is wrong. The judgment is affirmed.

FLANIGAN, C.J., and PARRISH, P.J., concur.