In re the Marriage of Jack
WINTERS, Appellant,

v.

Jacqueline C. WINTERS (Barnetski-Gep-
ford), Respondent.

No. WD 31993.

Missouri Court of Appeals,
Western District.

May 4, 1981.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 2, 1981.

Application to Transfer Denied
July 14, 1981.

Charles W. Gardner, Lee's Summit, for appellant.

Richard Rose, Kansas City, for respondent.

Before PRITCHARD, P. J., and TURNAGE and CLARK, JJ.

PRITCHARD, Presiding Judge.

The dispute between the parties concerns the award of custody of three sons born of the marriage, who were born, respectively, December 4, 1963, May 24, 1965, and November 22, 1967. The custody matter was presented on a motion to modify the original 1969 decree.

The parties were divorced on July 9, 1969, and the custody was awarded to respondent mother, subject to appellant father's temporary custody for a period of three months each summer, alternate holidays and all weekends during the school year. Shortly after the divorce, respondent married a person by the name of Barnetski, that marriage being dissolved on October 23, 1979. She then married Gepford, and that marriage subsisted at the time of the hearing.

For some six months prior to March, 1979, respondent was having problems with alcohol. Out of concern for her children, she requested appellant temporarily to take care of the sons, which he did. Respondent then entered Truman Medical Center for treatment of the alcoholic problem, and it was there that she met her present husband, Gepford. Prior to that time, according to respondent, there had been no marital relations between her and Barnetski since October 1977.

The present husband of respondent, Gepford, admitted that he is an alcoholic, and had problems for the last ten years. He underwent treatment for that ailment at several hospitals and facilities. He was self-employed in remodeling, worked also as an employee of a sewer service company, and had earned over $3,000 gross in the past two months. It was his testimony that he had not been drunk for four months prior to the instant hearing, which began on November 21, 1979.

Appellant's wife, Mary Winters, testified that they have three children born of their marriage, ages 6, 4, and 22 months. The three sons of the parties here get along well with those children. She saw Gepford on one occasion in respondent's home lying on the floor embracing one another, and it appeared that they had been drinking. The fourteen year old son had gone up to his room, and she supposed he walked right past respondent and Gepford. Respondent was then married to Barnetski. Mary saw appellant kick in a car radio because it was set on a religious station. He has a temper, and kicks or strikes things when he is angry. He knocked Mary down one time. He drinks about a six pack of beer a week.

Respondent testified that she had not lived with Barnetski as husband and wife for over two years before they were divorced, which occurred in October, 1979. She had a problem with alcohol about the first of 1979, and went twice to Truman East Medical Center for detoxification, 16 days the first time and 12 hours the second. She afterward went twice to Western Missouri Mental Health Center voluntarily for alcoholism. She was drunk for one night in July, 1979, but had not been drunk in the last four months before trial, nor had her husband, Gepford. She was not at the time of trial dependent on alcohol; she has the problem very well in hand, and there was no doubt in her mind that she would ever start drinking as before. "[T]he thought of a drink would practically make me physically ill, just to think of it." In November, 1978, when she started depending upon alcohol as a crutch, she "had not a second" to herself going to school full time; she was having an affair and did not know how to handle it; she was caring for three children; she taught 7 children piano, and she just cracked. Appellant also had her babysit his children 2 or 3 times during the week. Respondent also testified to having an affair with a music instructor from Longview College. According to respondent, appellant paid only a total of $20.00 child support in 1978. Barnetski testified he paid about 10% of child support. There was an answer to interrogatories signed by respondent that appellant had paid $14,940 total toward child support obligations, but she testified that she did not know where that figure came from. The original decree provided for $45.00 per week child support to be paid by appellant except for the summer months when he had custody. That would have been in the neighborhood of $23,000 for the ten year period.

At the close of the initial hearing, the trial court ordered a home study by the Juvenile Court "to see what their thought is on the situation." The hearing resumed on April 18, 1980, and William J. Weiler testified: He was a deputy juvenile officer specializing in custody investigations. He had been employed in that capacity since November 13, 1979. His educational background consisted of a Master's Degree in philosophy, a Master's Degree in theology. He had three years of high school teaching and about eight years of college teaching experience, and twelve years of individual and family counselling. He interviewed appellant twice, once at the latter's home. He also interviewed the 3 children in the large, lower bedroom level of appellant's home separately and privately. He described that home as being in better than average condition. He also visited the very large, old farmhouse in which respondent resided when he interviewed her. He interviewed also those persons who were given as references by both parties. Respondent's information about her medical history corresponded with her medical records which he had. His recommendation to the court was that the children be returned to the custody of their mother, and that the father be given generous visitation rights but not for long periods of time, his concern being that long periods of time might involve appellant's using the children for long periods of hard work. The climate in appellant's home was one of tension and fear, but there were no signs of that in respondent's home.

The children were interviewed separately by the trial court in chambers. One, who would have been 16 years old in two weeks, told the court that he had been with appellant since two weeks before school was out. Living in appellant's home were his two younger brothers, two little stepbrothers, a stepsister and a grandfather spent a lot of time there, besides appellant and his wife. He and his brothers had to live in the rec room, and he did not get along with appellant at all. He whipped the boys when they did not need it with a belt or across the face with his hand. He got mad when the older boy asked him about child support and started whipping him. The boy told him it was a year and a half that he remembered that appellant had paid child support. He whipped the boys because they did not do homework, but according to the boy there was no time to do it because they were out hauling firewood, which appellant sold from

his ranch near Butler, Missouri, until 11:00 or 11:30 p. m. He would rather be with respondent, even knowing about Gepford. He told the court that appellant drank as much as respondent.

The son, aged 14, wanted to go with his mother, "[B]ecause from what I have heard she's a lot better." He knew that when he moved in with appellant, respondent had gone to the hospital for "detox". This son was getting along with his father "so-so". "A. Every now and then he gets drunk or something and makes us work. I figure a little too much. Like, you know, his business is mainly real estate, but we have a farm and ranch, and we have to go down there and work a whole lot, and really, you know, I was born in the city and raised in the city. I don't especially care for farm work." His version was that both parties whipped them when they needed it as discipline. He told the court that he was not the type who got in trouble, but his two brothers tended to get in trouble a little more than he, so the smaller brother had been whipped with a belt. Although the boys had to awaken respondent when she slept late, she always fixed breakfast for them. The youngest son also expressed a preference to be with respondent.

At the close of all the evidence, the trial court allowed $500.00 attorney's fees to respondent and remarked, "* * * It's remarkable how well the children have done under the conditions in which they have lived in both the mother's and father's homes. Neither home has anything positive to recommend it. One gets to the question of which is worse. The mother appears to be loving and caring for the children, but is apparently an alcoholic and in a very questionable moral situation. The father of the children never supported them, appears cold, and the children claim he uses them, and this appears true. He also has a violent temper. My observation at the time [original hearing] was, the children should be with the mother if she gets her act together, but in my opinion this probably will not happen. The father is a second choice. Then after that is the time that I ordered the home study which indicates, in the juvenile court

worker's opinion, that the mother is in satisfactory condition to take care of the children now, and those are the reasons that I'm entering the judgment that I am." [Brackets added.] The court then entered a judgment finding, "[A]fter hearing the evidence finds that a modification of child custody is not necessary; in that there has not been a substantial and continuing change of circumstances since the original decree of divorce; * * *." Appellant's temporary custody rights were reduced to one month per year during the childrens' summer vacation, to be agreed to by the parties.

■ Appellant's Point I, in essence, is that the evidence that his having custody was to the best interest of the teen-age sons, and the judgment was against the weight of the evidence in that respondent was openly and grossly immoral and did not furnish a proper home. He says further that respondent's evidence was insubstantial, contradictory and not credible, appellant should have been granted custody, the wishes of the sons notwithstanding, since his home is the only one which provides a proper environment for them.

The evidence does show that respondent was having an affair with Gepford, and perhaps then with another man, during the time she was married to Barnetski, although she had not lived with the latter as husband and wife for two years. There is no evidence that any of these encounters took place in the presence of the sons, with the *possible* exception of Karl having seen respondent and Gepford embracing on the floor, to which appellant "supposed" Karl had seen on his way up to his room, testimony which the trial court did not have to believe. Respondent freely admitted that she had a problem with alcohol, by reason of which she commendably voluntarily relinquished custody to appellant while she sought treatment. She received treatment, and according to the evidence, had halted her use of alcohol, which in the trial court's determination removed that impediment to her having custody. Although respondent's

technical extra-marital conduct would not measure up to accepted mores of society, there was no definite evidence that it had any adverse effect on the sons. See *In re the Marriage of L___ M___*, 541 S.W.2d 760, 761[4, 5] (Mo.App.1976), where it was said, "The mother's adultery does not alone mark her as unfit to have custody. It is the effect on the child, and exposure to unseemly conduct, which is the major consideration. (Citing cases.)" See also *In re Marriage of Noeltner*, 569 S.W.2d 8, 10 (Mo. App.1978).

The evidence was not insubstantial, contradictory or not credible. The court was entirely correct in ruling that there had been no substantial and continuing change of circumstances since the original decree. The evidence does not conclusively demonstrate that appellant's home environment is superior to that of respondent. The boys live in an improvised recreation room in appellant's home, where, as the evidence shows, is sometimes cold. They are required to labor in appellant's firewood business, sometimes in cold weather, thus supporting the finding that he is using them. He is further possessed of a violent temper as the testimony clearly reveals. Furthermore, these three sons, not being of tender years, expressed the preference to be with their mother. Their answers to questions put to them in conference show that they understood their situation, and those answers show that each of them have good intelligence. Another factor which the trial court could consider was appellant's failure to pay the stipulated child support in the past, thus demonstrating his lack of real concern for the children, as the trial court could conclude. Point I is overruled.

█ Points II, III and IV are interrelated on the grounds that the trial court erroneously based its decision on the home study report (ordered to be made by the court); that the report was never offered into evidence, therefore this court is "denied an essential record upon which it can function with confidence"; that the court based its decision upon incompetent evidence, over objection of counsel, because it was based upon the home study report which was cursory and limited and could not support the judgment, and the refusal of the investigatory agency (the juvenile court) to consider more than five references, rendered the report inadequate; and that the social worker refused to comply with the statutory provisions [§ 452.390] and prevented access to his notes, and in admitting into evidence the social worker's conclusion because it was based upon hearsay and was inadmissible.

The investigative report was not marked as an exhibit or received in evidence. Counsel for appellant was permitted to read it during a short recess of the trial, and quite apparently, he cross-examined witness Weiler about his investigation. That examination related principally to Weiler's direct examination testimony, with respect to which he clearly qualified as an expert and could give his opinions based upon his personal observations. In view of the testimony of the three children that they had been required to do hard work, Weiler's testimony that if appellant had custody for long periods of time, the hard work "might" continue, although of a speculative nature, is not grounds to set aside the judgment. There is no indication that the trial court based its judgment on the report, other than to remark, supra, "* * * I ordered the home study which indicates, in the juvenile worker's opinion, that the mother is in satisfactory condition to take of the children now, * * *." What was clearly before the court was Weiler's testimony about what he observed and learned in conferring with the parties, thus there was no hearsay; there was no evidence that the investigatory agency refused to consider more than five references; there was no objection that the home study report was cursory and limited. There was no renewal of the objection that the social worker refused to comply with the requirements of § 452.390 of giving to counsel copies of the report 10 days before trial, and no request was made for continuance to give opportunity to meet it. In sum, however, the evidence recounted above, including the three sons' preference to reside with their mother, is sufficient to support the trial court's judgment without

the report which is merely corroborative. Points II, III and IV are overruled.

The first part of the hearing concluded on December 17, 1979. The trial resumed on April 18, 1980, at which time the court informed appellant's counsel that he would not be permitted to interrogate as to events prior to December because "I don't intend to go back and retry the case." Counsel then withdrew the question put to a witness, and proceeded to question her as to events since that date. No offer of proof was made as to any matter of newly discovered evidence. In this posture, no error may be predicated upon the trial court's limiting the evidence at the second phase of the hearing, and Point V relating to that matter is overruled.

Appellant, by Point VI(A), contends that the trial court erred in failing to give sufficient weight to the "Missouri presumption" that teenage sons should be placed in the father's custody. No such "presumption" exists in this state. Cited is 29 Mo. Bar Journal, 519, 520, where the salutary effect of a father having custody of a boy approaching adolescence years is discussed, so he could identify with him, as being one of the "rules of thumb" which a trial court could employ, all things being equal. See also *Wood v. Wood*, 400 S.W.2d 431 (Mo.App.1966). But here there was evidence that the appellant had a violent temper; the older son did not get along with him at all; he disciplined them with a strap and hitting them with his hand, and above all, each son expressed the preference to be with respondent. In these circumstances, the trial court correctly ruled that the best interests of the sons would be served by their remaining with respondent. Point VI(B) is that because of a temporary order of custody, made in August, 1979, to appellant, the burden of proof shifted to respondent to show a change of circumstances so substantial and continuing as to make the terms of the original judgment unreasonable. Appellant sought to modify the original decree, and thus the burden of proof to show changed circumstances was upon him as has often been held. See *Randle v. Ran-*

*dle*, 560 S.W.2d 876 (Mo.App.1977); *Christianson v. Christianson*, 592 S.W.2d 505 (Mo. App.1979). The fact that respondent voluntarily relinquished custody while she sought medical treatment, and the fact that a temporary order of custody was made pending hearing, do not change the rule. Point VI in its entirety is overruled.

Appellant attacks the trial court's procedure in interviewing the sons in chambers. The record shows that appellant's counsel was present, as required by statute, and participated. The record shows that the trial court did nothing to produce a chilling effect and the contention is frivolous. The trial court made a further finding that "The father of the children never supported them". This is in error, but the record supports the conclusion that appellant paid only a small portion of the $45.00 per week child support over the ten year period. No prejudice to appellant appears in the trial court's erroneous statement. Point VII raising these matters is overruled.

Point VIII charges the trial court with error in restricting appellant's visitation rights to 30 days each summer. The grounds are that this matter was not put into issue by the pleadings, and the evidence was insufficient to support a *sua sponte* modification of the decree.

The first ground is met by *S___ v. G___*, 298 S.W.2d 67, 74[1–4] (Mo.App.1957), where it was said, "The court may award custody even though no request therefor has been made in a petition. And the books contain many cases where the court has disregarded the prayers of both parties and awarded custody in a manner not asked for by either." See also *Allen v. Allen*, 433 S.W.2d 580, 583 (Mo.App.1968), following *S___ v. G___*, supra, and noting the early case of *In re Morgan*, 117 Mo. 249, 22 S.W. 913 (1893); *Smith v. Smith*, 558 S.W.2d 785, 788 (Mo.App.1977). If a court may award custody without a request therefor in the best interests of a child, certainly it may do likewise in the matter of visitation rights. See *Gayman v. Gayman*, 559 S.W.2d 617, 618 (Mo.App.1977), quoting paragraph 2 of

§ 452.400, and it was said, "It leaves no room for doubt that the 'best interests' of the child is the polestar to guide on when charting restrictions to parental visitation rights." In the *Gayman* case, there was nothing said as to a necessity to find that in a restriction of visitation rights, the visitation would endanger the child's physical health or impair his emotional development. In this case, there was no entire restriction on appellant's visitation rights. There was just a reduction of the same, and thus there was no requirement to make the foregoing findings. The evidence is clearly sufficient to support the award, and Point VIII is overruled.

Respondent made an oral motion for her attorney fees, and the court allowed $500.00. There was no evidence as to the reasonableness of that fee in the light of the attorney's expenditure of time; there was no evidence of respondent's need to have her attorney's fees paid by appellant; and there was no evidence of his ability to pay the same. This necessitates remanding the portion of the case for further hearing. *Stanfill v. Stanfill*, 505 S.W.2d 438 (Mo.App. 1974); *Carr v. Carr*, 480 S.W.2d 317 (Mo. App.1972).

The judgment is reversed as to that part allowing attorney fees and the case is remanded for further proceedings thereon. In all other respects, the judgment is affirmed.

All concur.