# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

**FILED**

**July 21, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| JOHN MICHAEL GORSKI, | ) | |
| | ) | |
| Plaintiff/Appellant, | ) | Sumner General Sessions, Division II |
| | ) | No. 2402-G |
| VS. | ) | |
| | ) | Appeal No. |
| LINDA EMILY GORSKI RAGAINS, | ) | 01A01-9710-GS-00597 |
| | ) | |
| Defendant/Appellee. | ) | |

APPEAL FROM THE
SUMNER COUNTY GENERAL SESSIONS COURT, DIVISION II

GALLATIN, TENNESSEE

THE HONORABLE BARRY R. BROWN, JUDGE

For Plaintiff/Appellant:

Joe P. Binkley, Jr.
Nashville, Tennessee

For Defendant/Appellee:

Michael W. Edwards
Hendersonville, Tennessee

## VACATED AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

## O P I N I O N

This appeal stems from a protracted post-divorce custody dispute. Shortly after the divorce, the father filed a change of custody petition in Division II of the Sumner County General Sessions Court, and the court awarded him primary physical custody on a temporary basis. Over two years later, the general sessions court dismissed the father's petition and ordered that the children be returned to their mother. We vacate the order dismissing the father's change of custody petition because the evidence does not support the general sessions court's conclusion that there had been no material change in the children's circumstances since the divorce.

### I.

John Michael Gorski and Linda Emily (Gorski) Ragains are the parents of two children – Jonathon Edward Gorski, born in January 1988, and Haley Analissa Gorski, born in June 1990. After their marriage foundered, Mr. Gorski and Ms. Ragains entered into a marital dissolution agreement addressing all custody, support, property, and other issues between them. Even though he was aware that Ms. Ragains abused alcohol, Mr. Gorski agreed in the marital dissolution agreement that Ms. Ragains would have sole custody of their children. Accordingly, when the parties were divorced in 1994 in the Sumner County General Session Court, Division II,[1] Ms. Ragains received sole custody of the parties' children, and Mr. Gorski received visitation rights in accordance with the marital dissolution agreement.

Ms. Ragains went into an emotional tailspin following the divorce.[2] Many of the parties' mutual friends seemed to gravitate toward Mr. Gorski, and Ms. Ragains lost her former social context. Her abuse of alcohol became more acute. Her

---

[1]Division II of the Sumner County General Sessions Court has concurrent jurisdiction with the circuit and chancery courts over "domestic matters." *See* Act of Mar. 10, 1982, ch. 236, § 3, 1982 Tenn. Priv. Acts 89, 89-90, *amended by* Act of May 11, 1989, ch. 93, § 2, 1989 Tenn. Priv. Acts 186, 186-87.

[2]She explained later that "I was so hurt and devastated by this divorce. I thought I wanted it, and I didn't know how to live without [Mr. Gorski]."

financial problems forced her to obtain a part-time job as a server in a restaurant.[3] When she was eventually evicted from her apartment, she and the children moved into her father's and step-mother's home.

Ms. Ragains' continued alcohol abuse contributed to several bizarre incidents between late 1994 and early 1995. On one occasion, Ms. Ragains appeared at Mr. Gorski's apartment late at night and kicked in a window. On another occasion, Ms. Ragains telephoned Mr. Gorski in the early morning hours and demanded in loud and profane language that he come right over and pick up the children. On other occasions, Ms. Ragains told Mr. Gorski that the children were no longer her priority. Finally, on Super Bowl Sunday in 1995, Ms. Ragains left the children on the doorstep of a house where Mr. Gorski was attending a Super Bowl party.[4]

On February 6, 1995, less than four months after the divorce, Mr. Gorski filed a change of custody petition. He alleged, among other things, (1) that Ms. Ragains had lost her ability and desire to care for the children, (2) that Ms. Ragains had shown an unstable employment history since the divorce, and (3) that Ms. Ragains often had been drinking when she picked up the children from visitation. He also asserted that a material change in circumstances had occurred and that he should be awarded both temporary and permanent custody of the children. On February 17, 1995, before Ms. Ragains had even answered Mr. Gorski's petition, the general sessions court entered an order temporarily changing the existing custody arrangement to joint custody, placing the children under the protection of the Department of Human Services in order to conduct home studies of the both parents' homes, and setting a March 1995 hearing on Mr. Gorski's petition to change custody.

Ms. Ragains responded to Mr. Gorski's petition by denying that there had been a material change in the parties' circumstances after the divorce. On March 22, 1995, the parties submitted an agreed order providing that they would have joint custody

---

[3]Mr. Gorski would have us believe that it is significant that Ms. Ragains was employed as a server at a Hooter's restaurant. Other than illustrating Ms. Ragains' need for a second job in order to make ends meet, we attach little importance to the fact that Ms. Ragains chose to work at this particular restaurant rather than somewhere else.

[4]Concerning this unhappy period in her life, Ms. Ragains later candidly admitted that "I couldn't control my own life, much less my kids. I mean do you think they're going to have respect for their mother who is abusing alcohol like it was . . .."

until the final disposition of Mr. Gorski's petition. During this time, Ms. Ragains also sought help for her alcohol abuse. She began attending both Alcoholics Anonymous and professional counseling, and eventually, she was able to stop drinking. She also obtained part-time work at both United Parcel Service and First Tennessee Bank and attended a court-ordered parenting class. As a result of these interventions, Ms. Ragains' bizarre conduct stopped.

In May 1995, the parties submitted another agreed order continuing the joint custody arrangement but naming Mr. Gorski as the children's "primary custodian." At this point, the general sessions court evidently decided to supervise this custody dispute on an on-going basis rather than to hear and act on Mr. Gorski's change of custody petition that had been filed three months earlier. Rather than setting Mr. Gorski's petition for a dispositive hearing, the general sessions court's May 1995 order merely recited that "this matter shall be reviewed by the Court on Friday, August 4, 1995."

Thereafter, for the next two years, the general sessions court held a hearing before the children's school year resumed to "review" the case. During the hearing held in the summer of 1995, the court awarded custody of the children to Mr. Gorski "on a temporary basis" to be "reviewed" next summer. At the 1996 hearing, which was not held until October 1996, the court ordered the continuation of the temporary custody arrangement but also increased Ms. Ragains' visitation and ordered her to begin paying child support to Mr. Gorski. The court also directed that "[t]his matter shall be set for a final hearing upon motion of either party . . . during the month[s] of June, July or August, 1997."

In May 1997, Ms. Ragains filed a motion requesting a final hearing and asking that the children be returned to her. The general sessions court held a hearing on July 18, 1997 and heard a number of witnesses, including the parties themselves, Mr. Gorski's live-in girlfriend, and Frank Ragains, Ms. Ragains' then soon-to-be new husband. The evidence at that hearing showed that Ms. Ragains had quit drinking and that she had started a full-time job at a department store. It also showed that she was engaged to be married later in the summer and that she wanted to enroll the children in parochial school. In addition, Ms. Ragains described her plans for the children including academics, sports, and extracurricular activities. When asked

directly why she wanted sole custody of the children, she said, "Well, a lot of things have changed."

On August 5, 1997, over two and one-half years after Mr. Gorski filed his petition, the general sessions court entered its order finally resolving the custody issue. The court found that Mr. Gorski had been aware of Ms. Ragains' abuse of alcohol when he originally agreed to give her sole custody of the children. The court also determined that Ms. Ragains no longer abused alcohol and, therefore, that there had been no "drastic, permanent change since the time of the divorce." The court specifically found that the children had fared well while living with Mr. Gorski and that both parents were currently "capable parents who love their children." Even though the court did not find specifically that changing the joint custody arrangement that had been in place since 1995 would be in the children's best interests, it dismissed Mr. Gorski's petition and directed that "the parties shall revert to the Final Decree of Divorce of October 31, 1994." Accordingly, Mr. Gorski was required to return the children to Ms. Ragains.

## II.

Mr. Gorski raises two related issues with regard to the general sessions court's decision in this case. First, he asserts that the court improperly placed the burden on him during the July 1997 hearing to prove the existence of a material change in circumstances warranting a change in custody. Second, he asserts that the evidence does not support the court's conclusion that there had been no material change in circumstances since the entry of the original divorce decree. While we have determined that the general sessions court properly placed the burden of proof on Mr. Gorski, we find that Mr. Gorski successfully proved that the children's circumstances had changed materially since the divorce.

## A.

We turn first to the burden of proof issue. Procedural issues such as this one are of consequence in custody proceedings because following consistent and correct procedures is one of the surest ways for the courts to make real the legal system's

-5-

aspiration to provide equal justice under the law. Procedural rules are particularly important in domestic relations matters because they provide the chief means for keeping the exercise of judicial discretion within proper bounds. *See* Carl E. Schneider, *Discretion, Rules, and Law: Child Custody and the UMDA's Best-Interest Standard*, 89 Mich. L. Rev. 2215, 2218 (1991) (noting that "family law lives in a tension between according officials discretion to make decisions and limiting that discretion by requiring them to follow rules").

The procedural rules applicable to this case are both statutory and decisional. Tenn. Code Ann. § 36-6-101(a)(1) (Supp. 1998) empowers courts to make initial custody decisions and to change or modify existing custody arrangements "as the exigencies of the case may require." Thus, by statute, initial custody decisions are neither set in stone nor written in sand. While they govern all factual circumstances known to the trial court up through the time of their rendering, initial custody decisions do not prevent a trial court from subsequently modifying a custody arrangement when required by unanticipated facts and subsequently emerging conditions. *See Smith v. Haase*, 521 S.W.2d 49, 50 (Tenn. 1975); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997); *Woodard v. Woodard*, 783 S.W.2d 188, 189 (Tenn. Ct. App. 1989); *McDaniel v. McDaniel*, 743 S.W.2d 167, 168 (Tenn. Ct. App. 1987).

The statutory prerogative to change existing custody arrangements does not, however, give trial courts a license to shuttlecock children around. In the interest of continuity and stability, a trial court ordinarily should not consider changing its initial custody decision until (1) it is satisfied that the child's circumstances have changed in a material way since the entry of the presently operative custody decree, (2) it has carefully compared the current fitness of the child's parents, and (3) it has concluded that changing the existing custody arrangement is in the child's best interests. *See Adelsperger v. Adelsperger*, 970 S.W.2d at 485; *see also Peters v. Peters*, No. 02A01-9810-CH-00283, 1999 WL 285891, at * 5 (Tenn. Ct. App. May 10, 1999) (No Tenn. R. App. P. 11 application filed); *Knight v. Knight*, No. 01A01-9710-CV-00609, 1999 WL 20775, at *1 (Tenn. Ct. App. Jan. 20, 1999) (No Tenn. R. App. P. 11 application filed); *Brown v. Brown*, No. 02A01-9709-CV-00228, 1998 WL 760935, at *12 (Tenn. Ct. App. Nov. 2, 1998) (Farmer, J., concurring) (No Tenn. R. App. P. 11 application filed).

In terms of procedure, the party seeking to alter an existing custody arrangement must show that the circumstances surrounding the child have materially changed in a way that could not be reasonably foreseen at the time of the original custody decision and that the child's best interests will be served by changing custody. *See Adelsperger v. Adelsperger*, 970 S.W.2d at 485; *see also Solima v. Solima*, No. 01A01-9701-CH-00012, 1998 WL 726629, at *3 (Tenn. Ct. App. Oct. 16, 1998) *perm. app. denied* (Tenn. Apr. 19, 1999). This burden remains on the party challenging the court-ordered custody arrangement, even if that party has obtained temporary custody of the child, either by agreement or by court order, while the change of custody proceeding is pending. *See Mills v. Mills*, 818 P.2d 339, 342 (Idaho Ct. App. 1991); *Winters v. Winters*, 617 S.W.2d 585, 590 (Mo. Ct. App. 1981); *Miller v. Miller*, 305 N.W.2d 666, 673 (N.D. 1981); *Garvin v. Garvin*, 271 S.E.2d 413, 413 (S.C. 1980).

In this case, Mr. Gorski filed the petition to change custody while he was the non-custodial parent. Accordingly, as the moving party,[5] he had the burden of demonstrating (1) that a material change in circumstances had occurred, (2) that he was comparatively more fit than Ms. Ragains to be the children's custodian, and (3) that it would be in the children's best interests for him to be the custodial parent. The fact that the children had been temporarily in his custody since 1995 did not shift the burden to Ms. Ragains.

## B.

No one-dimensional statement of the applicable legal rules can resolve this particular case. Real world complexity steals into the equation when we consider, as we must, that events and lives have not stood still while this custody dispute has been in the courts. At this stage of the proceeding, we cannot ignore the fact that all the parties' circumstances are not the same as they were when they were last before the trial court.

---

[5]The moving party retains the burden of proof and persuasion with regard to motions and petitions pertaining to child custody. *See Nichols v. Nichols*, 792 S.W.2d 713, 715 (Tenn. 1990); *Rust v. Rust*, 864 S.W.2d 52, 56 (Tenn. Ct. App. 1993).

Drawing from common sense observation, experience, and child development theory, child custody law places a value on continuity and stability in children's lives. Our decisions reflect this belief. *See, e.g., Taylor v. Taylor*, 849 S.W.2d 319, 328 (Tenn. 1993); *Adelsperger v. Adelsperger*, 970 S.W.2d at 485; *Contreras v. Ward*, 831 S.W.2d 288, 290 (Tenn. Ct. App. 1991). Thus, while human behavior rarely lends itself to neatly drawn lines of direct cause and effect,

> The notion is that to grow and flourish a child is entitled to and needs the security of a permanent place with permanent ties to a parent figure; moreover, even occasional environmental or familial changes, as well as the threat or fear of such changes, will undermine the child's sense of stability and therefore the child's comfort and security.

National Interdisciplinary Colloquium on Child Custody, *Legal and Mental Perspectives on Child Custody Law: A Deskbook for Judges*, § 20:1, at 238 (1998).

Prompt resolution of custody matters can help provide children with stability and continuity. *See King v. King*, No. 01A01-9110-PB-00370, 1992 WL 301303, at *2 (Tenn. Ct. App. Oct. 23, 1992) (No Tenn. R. App. P. 11 application filed). Therefore, while we recognize that custody disputes are often among the most difficult cases for courts to satisfactorily resolve, their prompt and conclusive dispositions serve everyone's best interest. *Gallagher v. Adkins*, No. 87-342-II, 1988 WL 34085, at *5 (Tenn. Ct. App. Apr. 15, 1988) (Koch, J., concurring) (No Tenn. R. App. P. 11 application filed).

On occasion, trial courts will be compelled to make temporary alternations of custody decisions in order to safeguard the children and to protect the integrity of the judicial process. *See King v. King*, 1992 WL 301303, at *2. Temporary alterations of existing custody arrangements should be limited to circumstances where clear and convincing evidence shows that a child is being harmed or is about to be harmed where he or she is. *See Gallagher v. Adkins*, 1988 WL 34085, at *6 (Koch, J., concurring). They should, in virtually all circumstances, amount to nothing more than a preliminary decision that one or the other parent will keep the children until a reasonably prompt full hearing on custody can be held. *See Fountain v. Fountain*, 365 So. 2d 1139, 1142 (La. Ct. App. 1978); *Deffenbaugh v. Deffenbaugh*, 596 P.2d 966, 971-72 (Ore. 1979).

We emphasize this point about post-divorce temporary custody for two reasons. First, courts should not be too hasty to ignore their previous final custody decisions when they are called upon to re-enter the divorced parents' wrangles. Once a court fashions a permanent custody arrangement, a new family unit forms, and this new family unit is entitled to be protected from adverturistic governmental intrusion. *See Rust v. Rust*, 864 S.W.2d at 55-56 (stating that the concept of custody is inextricably linked with parents' rights to be free from unwarranted outside interference with their child rearing). When courts must intrude into the otherwise private realm of family life, they should do so in a way calculated to interfere with the parent-child relationship as little as possible. *See Rust v. Rust*, 864 S.W.2d at 56; *Neely v. Neely*, 737 S.W.2d 539, 542 (Tenn. Ct. App. 1987). It is difficult to imagine an act intruding into the parent-child relationship more than wrenching a child away from one parent and giving the child to the other parent, albeit temporarily.

Second, awards of temporary custody inevitably destabilize the equation for modifying permanent custody. Quite often, they will insidiously shift the momentum in the case to the temporary custodian. *See*, *e.g.*, *Bjork v. Bjork*, No. 01A01-9702-CV-00087, 1997 WL 653917, at *2-6 (Tenn. Ct. App. Oct. 22, 1997) (No Tenn. R. App. P. 11 application filed) (awarding a post-divorce change of permanent custody to a father following a lengthy award of temporary custody to the father). As we have previously pointed out, temporary custody, when permitted to continue over a long period, creates a "new status quo," and permits the parent with actual custody to establish a track record that heightens his or her chances of obtaining permanent custody. *See King v. King*, 1992 WL 301303, at *2.

## C.

This case, like *Gallagher v. Atkins* and *King v. King*, illustrates how the disposition of a petition to change custody can be rendered more difficult by a temporary custody arrangement that lasts for an extended period of time. The general sessions court , downplaying the fact that the children had been in Mr. Gorski's custody for approximately twenty-seven months, appears to have based its denial of Mr. Gorski's petition to change custody primarily on Ms. Ragains' successful efforts to stop abusing alcohol. Whether or not we approve of the court's use of temporary

custody in this case, we cannot ignore the extended period of time these children have spent with Mr. Gorski.

Any burden Mr. Gorski had to demonstrate a material change in the children's circumstances has been met in this case. The most striking change in the children's circumstance is that the children had been living with Mr. Gorski rather than Ms. Ragains. In addition, Ms. Ragains' expressions of disinterest in her children and her attempts to abandon them were unforeseen changes in circumstances. Because of these circumstances, the trial court erred by concluding that there had not been material changes in the children's circumstances since November 1994.

Because this record contains compelling evidence of a material change in the children's circumstances since November 1994, the general sessions court should have proceeded to compare the fitness of Mr. Gorski and Ms. Ragains to be the custodial parent and then should have determined whether it would have been in the children's best interests for them to remain with Mr. Gorski or to return to Ms. Ragains. In making the best interests determination, the general sessions court should have taken into consideration the bonding that may have occurred between Mr. Gorski and the children during the twenty-seven months they were living with him.

The general sessions court is better situated than we are to compare the fitness of the parties and to determine the placement for the children that will be in their best interests. These determinations require the careful balancing of many factors, *see Rogero v. Pitt*, 759 S.W.2d 109, 112 (Tenn. 1988); *Holloway v. Bradley*, 190 Tenn. 565, 571, 230 S.W.2d 1003, 1006 (1950); *Garner v. Garner*, 773 S.W.2d 245, 248 (Tenn. Ct. App. 1989), and may hinge on subtle nuances in the parties' demeanor and credibility. *See Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1997); *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). Thus, although this custody dispute has gone on too long as it is, we vacate the order granting Ms. Ragains sole custody of the children and remand the case with directions to the general sessions court to receive evidence concerning Mr. Gorski's and Ms. Ragains' current fitness to be custodial parents and then to make a final custody determination consistent with the children's best interests. During the

pendency of this hearing, the children shall remain in the sole custody of Ms. Ragains.

## III.

The order granting Ms. Ragains sole custody of Jonathon and Haley Gorski entered on August 5, 1997 is vacated, and the case is remanded for further proceedings consistent with this opinion. The costs on this appeal are taxed in equal proportions to John Michael Gorski and his surety and to Linda Emily Ragains for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:


_____
BEN H. CANTRELL,
PRESIDING JUDGE, M.S.


_____
WILLIAM B. CAIN, JUDGE